**Dated: July 3, 2024**

**The following is ORDERED:**



Paul R. Thomas
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

In re:

ARNOLD BROTHERS  
FOREST PRODUCTS, INC.  
    Debtor.

Case No. 24-80318-PRT  
Chapter 11 Subchapter V

### ORDER OF DISMISSAL

Before the Court is the Motion to Dismiss filed by AmeriState Bank seeking dismissal of this case pursuant to 11 U.S.C. § 1112(b).[1] After review of the record and based on the evidence presented to the Court, the Court finds that good cause exists to dismiss this case due to the Debtor's inability to establish a reasonable likelihood that a plan of reorganization will be confirmed and because further delay would be prejudicial to creditors.

### Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and § 1334(a). A motion to dismiss is a core proceeding which this Court may hear and determine as provided in 28 U.S.C.

---

[1] ECF No. 47.

Case 24-80318   Doc 158   Filed 07/03/24   Entered 07/03/24 14:01:49   Desc Main
Document   Page 1 of 15

§ 157(b)(2)(A). This Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 9014.

## Findings of Fact

Debtor is a Texas corporation located in Choctaw, Oklahoma, which packages and sells wood for cooking and other purposes. Its sole owner and president is James Wytt Belcher ("Belcher"). Debtor was placed into receivership in Choctaw County District Court in late March or early April of 2024. Debtor filed a chapter 11 bankruptcy petition in this Court on April 30, 2024.[2] The next day, Debtor filed an amended Petition electing to proceed under Subchapter V of Chapter 11.[3] Debtor also filed a *Declaration in Support of Debtor's Chapter 11 Petition*[4] ("Declaration"), and its first Motion to Use Cash Collateral.[5] In the Declaration, Debtor identified AmeriState Bank ("AmeriState") as its primary secured creditor with a debt of $1,950,000.00 secured by assets with an estimated value of $1,000,000.00 and a lien on all its cash. Debtor's Motion to Use Cash Collateral drew objections from AmeriState and the U.S. Trustee. After a hearing on May 6, 2024, this Court denied Debtor's Motion without prejudice, based on Debtor's inability to account for its use of cash, insufficient proof of need to avoid immediate harm, and failure to offer adequate protection.[6]

AmeriState filed a Motion to Dismiss Case[7] and a Motion for Relief from the Stay and Abandonment[8] on May 13, 2024. The Sub V Trustee filed a joinder of the Motion to Dismiss

---

[2] ECF No. 1. Mr. Belcher filed an individual chapter 11 bankruptcy petition in this Court on April 30, 2024, Case No. 24-80319.
[3] ECF No. 6.
[4] ECF No. 10.
[5] ECF No. 11.
[6] ECF No. 38.
[7] ECF No. 47.
[8] ECF No. 49.

based on Debtor's failure to provide proof of insurance on business assets.[9] The U.S. Trustee also filed a Motion to Dismiss for failure to provide proof of insurance.[10] On May 29, 2024, Debtor filed schedules and statements.[11] Its Summary of Assets and Liabilities lists total assets of $1,538,950.00, and total liabilities of $4,508,945.88, including secured claims totaling $2,177,116.24 and unsecured claims totaling $2,331,829.64.[12] Schedule A/B lists checking accounts totaling $6,400.00, and cash of $100.00. Accounts receivable are valued at $610,000. Inventory is identified primarily as logs/wood, with a total value of $460,000.00. A physical inventory was last conducted in 12/2022. Other assets include cars, trucks, trailers, forklifts and skid steers, customer lists, pending insurance claims, and a claim on a promissory note and for conversion against Randy's Firewood of Irving, Texas, valued at $268,000.00. Schedule D lists AmeriState's claim as $1,948,968.24, secured by cash, Logs/Wood, miscellaneous office items, and 9 vehicles, valued at $323,300.00. Other secured creditors consist of lien claimants on forklifts, skid steers, vehicles, and a computer server.

Debtor filed an Amended Motion to Use Cash Collateral proposing a replacement lien on post-petition assets in an amount equivalent to the decreased value of collateral resulting from Debtor's use of cash collateral, but did not propose adequate protection payments.[13] Debtor argued that authorization to use cash collateral was essential to its ability to continue operations. This Motion drew objections from AmeriState, the U.S. Trustee, and the Sub V Trustee. Debtor and AmeriState agreed to a one-week interim agreement that allowed Debtor to use $11,000.00 of cash collateral for identified expenses. The Court continued the hearing on the Motion, setting

---

[9] ECF No. 64.
[10] ECF. No. 67.
[11] ECF Nos. 77, 78.
[12] ECF No. 78.
[13] ECF No. 109.

it for evidentiary hearing on June 20, 2024 with AmeriState's Motions to Dismiss and for Relief From the Stay, the Sub V Trustee's Joinder in AmeriState's Motion to Dismiss and the U.S. Trustee's Motion to Dismiss.

At the June 20, 2024 evidentiary hearing, the first matter presented was Debtor's Amended Motion to Use Cash Collateral.[14] Debtor's accountant, Kenneth Taylor ("Taylor"), testified on behalf of Debtor. Taylor has served as Belcher's personal accountant for approximately fifteen years and has prepared Debtor's business tax returns for the last three to four years. Although not a C.P.A., Taylor has approximately eight years' experience as a state auditor and has had a tax and accounting practice for the last 24 years. Taylor has not been employed as a professional in a chapter 11 case, and has not prepared a cash collateral budget, feasibility analysis for a chapter 11 plan, or plan of reorganization. He has not analyzed Debtor's ability to propose a chapter 11 plan. However, Taylor has reviewed certain financial records and prepared projected budgets for Debtor for the remainder of 2024 for cash collateral purposes. He stated that the budget he prepared for the June 20th hearing is based on the best information he has available to date, including Debtor's 2021 and 2022 tax returns (which he prepared), Debtor's bank statements for the first four months of 2024, QuickBooks records regarding accounts receivable invoices, and information provided by Belcher. He has not reviewed complete financial records for 2023 as Debtor's QuickBooks records have only been updated through early 2023. Based on income for 2021 and 2022, Taylor projected an increase in income of 15% each month for the remainder of 2024. Based on the financial records Taylor reviewed

---

[14] Much of the evidence offered regarded the Amended Motion to Use Cash Collateral involved Debtor's historical financial records and projections regarding cash flow, receivables, and expenses. This evidence was also referred to and discussed by the parties and witnesses regarding other matters before the Court that day, including AmeriState's Motion to Dismiss. Therefore, the Court relies upon that evidence in rendering this Opinion.

and his experience as Debtor's accountant, his analysis showed that Debtor will have sufficient cash to continue operations during June and July of 2024, and enough cash flow to stay in business. The budget he prepared included monthly payroll of $25,000, based on information from Belcher. The monthly payroll includes payments to Belcher and family members, but Taylor had not been provided a breakdown of payroll expenses. Taylor has assisted Debtor to input more recent financial records in FreshBooks.

Belcher testified that Debtor's DIP bank account balance is $10,000.00. Insurance premiums for the next three months are paid. His wife contributed $7,500.00 into that account to assist with expenses. Weekly expenses are estimated at $9,000.00 to $10,000.00. Accounts receivable of $25,000.00 are expected in the next two weeks from three different customers. Belcher confirmed that Debtor's cash collateral budget projections of profits, after deducting cost of goods sold, of $128,000.00 for June and $104,000.00 for July are accurate.

Belcher provided some details regarding Debtor's financial projections. Debtor proposed monthly adequate protection payments to AmeriState of $15,000.00. Weekly payroll is approximately $6,500.00 for approximately six to eight employees, although he also described them as contract workers for which a separate expense was included. The total monthly workforce payroll is $27,000.00. Other monthly expenses include utilities, life insurance payments for Belcher and his wife, fuel, repair and maintenance costs, licenses or tags, and office supplies, although Belcher stated some of these expenses could be delayed or reduced. He stated that a reasonable budget for the next sixty days is $61,939.00 a month.

Debtor's operations are located on real estate owned by Belcher. Belcher does not currently charge Debtor rent. He intends to pay his upcoming monthly mortgage payments, but it was unclear to the Court whether Debtor would be the source of those funds. He did not know

Debtor's gross or net income for the month of May but verified that Taylor's budget accurately reflected Debtor's income for the first four months of 2024. Projected net income or positive cash flow for the month of June is $39,000.00, which includes some monies that were not generated by the business. He admitted that, since filing bankruptcy, Debtor has collected monies from accounts receivable and has spent some of those funds, although he did not know how much has been collected or how much has been spent.

David Payne, C.P.A. ("Payne"), testified on behalf of AmeriState as an expert witness regarding business valuations, insolvency and bankruptcy reorganizations. Payne requested financial information from Debtor, including bank statements, electronic accounting data, tax returns, sales tax reports, and information on Debtor's assets. Based on his review and analysis of the available business records, and the testimony and evidence presented thus far in the case, Payne did not believe there was sufficient information to properly value AmeriState's collateral since the petition date nor how collateral has been valued and reported on Debtor's tax returns.

Payne explained that to use cash collateral in this type of business, three elements are needed: (1) inventory, including what has been purchased and sold and an ending balance; (2) accounts receivable; and (3) the cash collateral portion. Debtor's financial records in QuickBooks are incomplete as they do not include expenses, and the 2023 tax return has not been provided. The 2021 and 2022 tax returns reported approximately $6,000,000.00 in annual revenues. This changed dramatically in the fourth quarter of 2023, based on Debtor's bank statements for that time frame, which were the only records available to him. These reflect monthly deposits and revenue of $84,000.00. Debtor's proposed budget is based on monthly revenues of $130,000.00, but it is not clear whether this includes accounts receivable and whether receivables are based on new or old sales. Also, it appears the revenue projections are

partially based on Debtor's business activity prior to September 2023, rather than its operations after sale of its Texas operations and its current situation. Since that sale, Debtor's monthly deposit or collection range is approximately $80,000.00. The current bank account balance of $10,000.00 is inconsistent with income numbers in Debtor's budget. As for projected expenses, the information provided to him was insufficient and inadequate to verify the accuracy of those numbers included in Debtor's budget. Therefore, Payne was unable to verify whether the proposed monthly payment to AmeriState was sufficient to adequately protect its position. And, because of a lack of complete financial records since the fourth quarter of 2023, Payne was unable to determine Debtor's current profit margin on its sales relative to its overhead, which is an important indicator to determine whether it is maintaining a sufficient level of cash relative to consuming receivables or inventory collateral.

At the conclusion of this evidence, the Court denied Debtor's Amended Motion to Use Cash Collateral, finding that Debtor failed to provide evidence of the value of its inventory securing AmeriState's claim. This prevented the Court from determining whether Debtor's offer of monthly payments adequately protected AmeriState.

The Court then heard testimony regarding AmeriState's Motion to Dismiss and Motion for Relief from the Stay, with the parties focusing on Debtor's ability to reorganize. Payne prepared a summary of the information included in the 2021 and 2022 tax returns. During those years, Debtor reported sales in excess of $6,000,000.00, with a monthly profit of approximately $50,000.00, and a good profit margin of ten to fifteen cents per dollar. More recent information shows that Debtor's current level of operations is approximately 25% of its operations in 2021 and 2022, and is no longer generating that level of income. Payne's analysis shows that Debtor's current level of profitability has decreased from a ten percent profit margin to a five percent

margin. Payne also prepared a historical balance sheet based on these two tax returns that showed Debtor's fixed assets. The assets listed on Debtor's bankruptcy schedules total $1,538,950.00 and were but a partial listing of those reported on the 2021 and 2022 tax returns, which were valued at approximately $6,000,000.00. He was unable to determine whether assets had been transferred or taken out of service. No real estate was listed in the bankruptcy schedules, but real estate was reported on the tax returns.

Payne was aware that Debtor sold its Texas operations in the fall of 2023 and that this sale resulted in a decline in revenues. He does not believe that projected sales and net income in Debtor's proposed budgets is realistic. Debtor's financial activity from the first four months of 2024 reflects prepetition average monthly sales below $100,000.00, and does not support Debtor's projected sales of $248,000.00 or more. Further, Debtor's available monthly income for those four months prior to paying prepetition retainers and legal fees averaged $9,500.00. Based on a collateral valuation pursuant to § 506 and Debtor's valuation of secured property in its schedules, Debtor would need to operate at a fifty to sixty percent profit margin to service its debt at a market rate of interest and have sufficient working capital, which historically it has not been able to do. Relying on the Schedules and presuming that Debtor's lender has a security interest in the majority of its assets, Debtor needs to generate well in excess of $100,000.00 each month to service the debt. When other fixed costs and expenses are added in — not including administrative costs — Debtor needs to generate $200,000.00 each month to have a reasonable chance to propose a feasible chapter 11 plan. With a current bank balance of $10,000.00, Payne stated that Debtor is grossly undercapitalized.

Payne acknowledged that Debtor's business fluctuates seasonally with higher revenue in colder months. However, based on Payne's experience in chapter 11 cases, Debtor's average

monthly revenue of $80,000.00 to $100,000.00 from late 2023 to date is insufficient to fund a feasible plan with a plan term of three to five years. Moreover, because Debtor has been unable to obtain authorization to use cash collateral, further operations will result in a natural degradation in the value of AmeriState's collateral.

Chay Shockey, Debtor's loan officer at AmeriState, testified that the current balance of Debtor's debt to AmeriState is $1,950,000.00. He agreed with the valuation of AmeriState's collateral included in Debtor's schedules. He also agreed with Payne's assessment that Debtor is unable to propose or fund a feasible chapter 11 plan. He does not believe that under the existing economic conditions, Debtor is able to successfully reorganize its business. AmeriState did agree to Debtor's sale of its Texas operations, received $17,000.00 from proceeds which brought Debtor's loans current as of September 2023, and allowed Belcher and Debtor to retain approximately $83,00.00 in proceeds for business operations. The buyer of the Texas operations, Randy's Firewood, was to make payments to AmeriState for Debtor's loans but Shockey does not believe any payments have been received for several months. He was recently contacted by Randy's Firewood regarding possible sale of the Debtor as it has a right of first refusal to purchase Debtor's business.

Belcher testified that although Debtor's schedules reflect $610,000.00 in accounts receivable at the time this case was filed, he believes that amount is too high. This is because part of these receivables – including checks of $50,000.00 – were stolen by the buyer. He has been unable to determine how much of pre-sale date receivables were kept by the buyer and not turned over to Debtor. Belcher believes that accounts receivable at filing were approximately $300,000.00. He also testified that the reported inventory valuation of $460,000.00 is too high. A physical inventory has not been conducted since 2022 but will be conducted for use in

preparing the 2023 tax return. Debtor offered 51 photographs of equipment and inventory located at Debtor's operation in Choctaw. Belcher testified that much of the machinery and equipment on the property is currently inoperable. However, all equipment is currently covered by general liability insurance. He estimated the value of inventory currently ready to ship is $20,000.00. Debtor regularly ships ten to twelve truckloads of wood per month to California, with a value of $6,000.00 to $12,000.00 per truckload. Debtor does not prepare an invoice for products sold until they leave Debtor's property. Belcher stated that Debtor will ship via common carrier $87,00.00 of product during the week surrounding the evidentiary hearing. Although he had not yet prepared written invoices of recent shipments, he did have a hand-written note containing a list and values of recent shipments totaling approximately $57,000.00 which will be invoiced for payment. Payment on these accounts receivables is expected within thirty days. Belcher was unable to recall total sales for the month of June. He admitted that the inventory Debtor has sold postpetition is AmeriState's collateral and that he had not obtained AmeriState's permission or consent to sell inventory.

      Debtor's financial difficulties began in October of 2023 when Debtor's payroll exceeded the balance in its bank account at AmeriState, and its payroll checks bounced. For eight years, Belcher had an agreement with Shockey and AmeriState that the bank would cover overdrafts on Debtor's bank account, and Debtor's account would always be replenished within a few days. However, that arrangement ended in October without notice. This event caused Belcher great distress, and he stopped using Debtor's AmeriState bank account.[15] Thereafter, Debtor began doing most of its business on a cash basis, with Belcher driving to Bank of the West in Texas to

---

[15] There were some funds in an AmeriState checking account postpetition, according to Belcher. *See also* ECF 78, Schedule A/B.

cash checks received as payment for goods sold. Payroll was paid in cash with employees noting receipt of payment on envelopes that contained the cash. Because he switched to cash and ceased using the AmeriState bank account, business records do not accurately reflect approximately $150,000.00 to $200,000.00 of income the business has generated from that time forward. The cash transactions were not recorded in QuickBooks. AmeriState eventually placed Debtor in a state court receivership without notice or service.

Belcher agreed that much of Payne's testimony was accurate. However, Debtor is a small business, and no one knows about the business operations but Belcher. Although the financial records do not reflect income generated, he believes Debtor is a viable business with sufficient income to sustain it and to fund a feasible plan. He disputed the figures provided by Shockey regarding the amount paid to AmeriState from the sale of Debtor's Texas operations. Debtor received $30,000.00 and AmeriState received $70,000.00 from that sale. By selling these operations Debtor's revenues were significantly reduced but expenses were also significantly reduced. Debtor has been very careful not to spend AmeriState's cash collateral. However, it was his belief that he could spend money in the DIP account if the source was personal funds. He estimated Debtor's bank account balance would be $30,000.00 within a few days of the hearing.

Belcher has no other source of income other than social security and Debtor's business operations. If AmeriState is allowed to proceed in its foreclosure and receivership action in state court, it would be unlikely that Belcher would have any ability to reorganize his personal bankruptcy case.

## Conclusions of Law

Section 1112(b)(1) provides in relevant part that "... on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under

chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause ...."[16] It is the movant's burden to prove by a preponderance of the evidence that cause for dismissal or conversion exists.[17] If cause is established, the burden shifts to the opposing party to establish that "unusual circumstances" exist that establish that dismissal or conversion is not in the best interests of creditors and the estate.[18] The objecting party must also establish under §1112(b)(2)(A) and (B), that there is a reasonable likelihood that (1) a plan will be confirmed within a reasonable time, (2) "cause" for dismissal includes grounds other than a continuing loss or diminution of the estate, (3) there is a reasonable justification for the act or omission that establishes grounds for dismissal, and (4) such actions will be cured within a reasonable period of time.[19] "The bankruptcy court has broad discretion under § 1112(b)."[20]

AmeriState asserts that cause exists for dismissal due to substantial or continuing loss to or diminution of the estate, the absence of a reasonable likelihood of rehabilitation, and unauthorized use of cash collateral.[21] AmeriState's expert witness, David Payne, testified that Debtor's lack of complete business records prevented him from accurately assessing the value of AmeriState's collateral including cash and receivables. However, without use of cash collateral Debtor will be unable to sustain its operations and AmeriState's collateral will diminish in value. Further, based upon his review of the available financial records, Debtor is unable to generate sufficient income to service its current debt. To propose a reasonable plan of reorganization and

---

[16] 11 U.S.C. § 1112(b)(1). Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.
[17] *In re Vista Foods, U.S.A. Inc.,* 226 B.R. 284 (Table) (B.A.P. 10th Cir. 1997) *citing In re Woodbrook Assocs.,* 19 F.3d 312 (7th Cir. 1994).
[18] § 1112(b)(2).
[19] *In re Whetten,* 473 B.R. 380 (Bankr. D. Colo. 2012) citing 7 Collier on Bankruptcy ¶ 1112.05[2], 16th Ed.
[20] *Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir. 1989).
[21] §1112(b)(4)(A) and (D).

rehabilitate this company, as Debtor desires, it must generate sufficient funds to service debt plus interest, pay administrative costs, and pay fixed costs and expenses. Payne estimates this will require $200,000.00 gross monthly income, not the $80,000.00 to $100,000.00 Debtor's records reflect it has generated. Therefore, there is no reasonable likelihood of rehabilitation. Furthermore, Debtor admitted to selling inventory without AmeriState's permission and using cash collateral without its permission. The Court finds that AmeriState established cause for dismissal by a preponderance of the evidence.

Debtor 's burden was to specifically identify unusual circumstances which demonstrate that dismissal is not in the best interests of creditors and the estate, and to show there is a reasonable prospect a plan will be confirmed within a reasonable period of time.[22] Debtor did not identify or establish any "unusual circumstances." Instead, Debtor argued that it can and will propose a feasible plan prior to the ninety-day deadline set forth in § 1189 for a Subchapter V debtor. But Debtor never explained how it would generate income to fund a plan without the use of AmeriState's cash collateral, nor did it establish how much it must pay to adequately protect AmeriState for Debtor's use of cash collateral or sale of inventory pursuant to § 363(b) in the ordinary course of business. Belcher's knowledge of the business is not questioned; however, based on Payne's detailed analysis, it is not reasonably likely that a feasible plan can be proposed and confirmed. Moreover,

> [a] Chapter 11 case can be dismissed at any time. Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired. Creditors, likewise, need not incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated. The very

---

[22] *Woodbrook Assocs.,* 19 F.3d at 317. *See also In re Picacho Hills Utility Co., Inc.,* 518 B.R. 75, 81 (Bankr. D.N.M. 2014) ("To remain in Chapter 11, debtors are generally expected to 'point to a reasonable plan of reorganization….'" (citations omitted).

purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless.[23]

Neither AmeriState's expert nor the Debtor's accountant had complete and accurate business records from which to testify as to whether the Debtor has a reasonable possibility of a successful reorganization. Nonetheless, Payne opined that based on his review and analysis of the business records made available to him, and his substantial experience evaluating similarly situated businesses, this debtor would not be able to effectively reorganize.

Debtor's accountant provided an analysis that was based in part on historical numbers and also on projections provided to him by Belcher that supports the Debtor's claim that it can reorganize. Belcher's beliefs and testimony otherwise, while sincere, were not supported by the evidentiary record established at trial sufficient to convince the Court that this debtor is able to reorganize within a reasonable time. Although it has only been two months since this case was filed, because Subchapter V timeframes are necessarily compressed, an arguably confirmable plan is due in this case by the end of July. Under the current circumstances, the Court does not think delay will prompt a different result.

No party suggested or argued that conversion of the case would be in the best interest of creditors or the estate. Instead, the Court's own analysis is that dismissal, rather than conversion, is in the best interest of creditors. Therefore, based upon the Debtor's admitted unauthorized use of cash collateral, the opinion of the expert witness, and the lack of convincing evidence supporting the Debtor's ability to effectively reorganize, the Court finds cause exists to dismiss this case.

---

[23] *Woodbrook Assocs.,* 19 F.3d at 317 (citations omitted).

## Order of the Court

For the reasons stated herein,

IT IS HEREBY ORDERED that AmeriState Bank's Motion to Dismiss (ECF No. 47) is **granted,** and this case is hereby **dismissed.**

IT IS FURTHER ORDERED that AmeriState Bank's Motion for Relief from the Stay and Abandonment (ECF No. 49), the Subchapter V Trustee's Motion for Joinder (ECF No. 64), and the U.S. Trustee's Motion to Dismiss (ECF No. 67) are moot.

# # #